UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DENISE KAPLAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 14 C 5720 |
| v. | ) | |
| | ) | Chief Judge Rubén Castillo |
| JPMORGAN CHASE BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Denise Kaplan brings this diversity action against Defendant JPMorgan Chase Bank, N.A. ("JPMC") alleging common law breach of contract based on her allegations that more than $1,000,000 was improperly withdrawn from her checking and savings accounts at JPMC by her estranged husband, Joel Kaplan. Presently before the Court are JPMC's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 and Plaintiff's motion for leave to file an amended complaint. For the reasons set forth below, the Court grants JPMC's motion for summary judgment and grants Plaintiff's motion for leave to file an amended complaint.

## RELEVANT FACTS[1]

Plaintiff is an Illinois resident. (R. 33, Pl.'s Rule 56.1 Resp. ¶ 4.) JPMC is a national banking organization with its main office in Ohio. (*Id.* ¶ 2.) JPMC has a branch located in Chicago, Illinois. (*Id.* ¶ 3.)

---

[1] The Court takes the facts from the parties' Local Rule 56.1 statements of material facts. (R. 22, Def.'s Local Rule 56.1(a)(3) Statement of Material Facts ("Def.'s Facts"); R. 33, Pl.'s Response to Def.'s Facts ("Pl.'s Rule 56.1 Resp."); R. 34, Pl.'s Local Rule 56.1(b)(3)(C) Statement of Material Facts ("Pl.'s Facts"); R. 40, Def.'s Response to Pl.'s Facts ("Def.'s Rule 56.1 Resp.").)

On January 12, 2009, Plaintiff opened two accounts with JPMC: a checking account ending in 4531 ("Account 4531") and a savings account ending in 7373 ("Account 7373") (collectively, the "Accounts"). (*Id.* ¶ 5.) When Plaintiff opened the Accounts, she executed a signature card for each of the Accounts (the "January 2009 Signature Cards"). (*Id.* ¶ 6; R. 1-1, Ex. A, Jan. 2009 Signature Card for Account 4531; R. 1-1, Ex. D, Jan. 2009 Signature Card for Account 7373.) The Accounts are governed by the Account Rules and Regulations (the "Account Terms") referred to on the signature cards Plaintiff signed. (R. 33, Pl.'s Rule 56.1 Resp. ¶¶ 7-9; R. 22-2, Ex. A, Account Terms for Dec. 31, 2008, through Dec. 31, 2010; R. 22-2, Ex. B, Account Terms for Jan. 1, 2011, through Jan. 31, 2012.) By signing the signature cards, Plaintiff "acknowledge[d] receipt of the [Account Terms] or other applicable account agreement, which includes all provisions that apply to this deposit account and the Bank Privacy Policy, and agree[d] to be bound by the terms and conditions contained therein as amended from time to time." (R. 33, Pl.'s Rule 56.1 Resp. ¶ 11; R. 1-1, Ex. A, Jan. 2009 Signature Card for Account 4531; R. 1-1, Ex. D, Jan. 2009 Signature Card for Account 7373.) Additionally, the Account Terms provide that "[b]y signing a . . . deposit account signature card, or by otherwise opening or maintaining a checking, savings or certificate of deposit . . . account with [JPMC], [Plaintiff] accept[s] and agree[s] to be bound by the terms and conditions of this Agreement." (R. 33, Pl.'s Rule 56.1 Resp. ¶ 10; R. 22-2, Ex. A, Account Terms for Dec. 31, 2008, through Dec. 31, 2010, at 13; R. 22-2, Ex. B, Account Terms for Jan. 1, 2011, through Jan. 31, 2012, at 51.)

The Account Terms provide that "[i]t's important to always take a few minutes to review each statement for accuracy: It's your responsibility to promptly notify [JPMC] of any unauthorized transactions or other discrepancies, generally within 30 days of the statement date." (R. 33, Pl.'s Rule 56.1 Resp. ¶ 35; R. 22-2, Ex. A, Account Terms for Dec. 31, 2008, through

Dec. 31, 2010, at 8; R. 22-2, Ex. B, Account Terms for Jan. 1, 2011, through Jan. 31, 2012, at

45.) The Account Terms also state that:

> If [JPMC] honor[s] a check . . . or other item drawn on or posted to your Account that is altered in any way or was not drawn or otherwise authorized by you ('unauthorized item') or if your Account statement contains any errors, you agree to notify us in writing of such unauthorized item or error within 30 days of the date on which the unauthorized item, or the Account statement that contained a description of the unauthorized item or error, was mailed, transmitted or otherwise made available to you.

(R. 33, Pl.'s Rule 56.1 Resp. ¶ 36; R. 22-2, Ex. A, Account Terms for Dec. 31, 2008, through

Dec. 31, 2010, at 19; R. 22-2, Ex. B, Account Terms for Jan. 1, 2011, through Jan. 31, 2012, at

57.) The Account Terms further state that:

> Failure to report an unauthorized item or error, or that you did not receive your scheduled statement, within the 30-day time frame set forth above, or to abide by the conditions set forth herein, shall be deemed conclusive proof that you failed to exercise reasonable care and promptness in examining the items and statements of the affected Account and in notifying [JPMC] of the unauthorized item or error. You agree that such items and errors shall therefore be fully enforceable against you and you shall have no claim against [JPMC] for same and shall be barred from bringing any action against us that is in any way related to the unauthorized item or errors.

(R. 33, Pl.'s Rule 56.1 Resp. ¶ 37; R. 22-2, Ex. A, Account Terms for Dec. 31, 2008, through

Dec. 31, 2010, at 19; R. 22-2, Ex. B, Account Terms for Jan. 1, 2011, through Jan. 31, 2012, at

57.)

> Additionally, the Account Terms provide that:

> If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, . . . [y]ou must contact [JPMC] within 40 calendar days of the date that we mailed (or otherwise delivered by a means to which you agreed) the substitute check in question or the account statement showing that the substitute check was posted to your account, whichever is later.

(R. 33, Pl.'s Rule 56.1 Resp. ¶ 38; R. 22-2, Ex. A, Account Terms for Dec. 31, 2008, through

Dec. 31, 2010, at 27; R. 22-2, Ex. B, Account Terms for Jan. 1, 2011, through Jan. 31, 2012, at

64.) The Account Terms also provide that "IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS . . . [JPMC] must hear from you NO LATER than 60 days after [JPMC] sent you the FIRST statement on which the problem or error appeared." (R. 33, Pl.'s Rule 56.1 Resp. ¶ 39; R. 22-2, Ex. A, Account Terms for Dec. 31, 2008, through Dec. 31, 2010, at 30; R. 22-2, Ex. B, Account Terms for Jan. 1, 2011, through Jan. 31, 2012, at 68.) Further, the Account Terms provide that "[y]ou agree to provide [JPMC] with all information necessary for [JPMC] to investigate the alleged error or unauthorized item, associated police reports, supporting affidavits, and testimony [JPMC] reasonably request[s]." (R. 33, Pl.'s Rule 56.1 Resp. ¶ 40; R. 22-2, Ex. A, Account Terms for Dec. 31, 2008, through Dec. 31, 2010, at 19; R. 22-2, Ex. B, Account Terms for Jan. 1, 2011, through Jan. 31, 2012, at 57.)

When Plaintiff opened the Accounts on January 12, 2009, she was the only signer on each of the Accounts. (R. 33, Pl.'s Rule 56.1 Resp. ¶ 16; R. 1-1, Ex. A, Signature Card for Account 4531; R. 1-1, Ex. D, Signature Card for Account 7373.) Subsequently, signed signature cards dated October 20, 2009 (the "October 2009 Signature Cards") with respect to the two Accounts were provided to JPMC. (R. 33, Pl.'s Rule 56.1 Resp. ¶ 17; R. 1-1, Ex. C, Oct. 2009 Signature Card for Account 4531; R. 1-1, Ex. E, Oct. 2009, Signature Card for Account 7373.) The October 2009 Signature Cards bear the purported signatures of both Plaintiff and her husband, Joel Kaplan. (R. 33, Pl.'s Rule 56.1. Resp. ¶ 18.) Plaintiff alleges that she did not sign the October 2009 Signature Cards. (*Id.* ¶ 19.) Joel Kaplan attests that Plaintiff gave him authority to sign the October 2009 Signature Cards on her behalf. (R. 40, Def.'s Rule 56.1 Resp. ¶ 4.) Plaintiff alleges that from October 20, 2009, to May 19, 2011, Joel Kaplan withdrew

without her knowledge or consent a total of $377,577 from Account 4531 and a total of $662,696 from Account 7373 (collectively, the "Transactions"). (R. 33, Pl.'s Rule 56.1. Resp. ¶ 20.)

JPMC asserts that from January 19, 2009, through May 2011, account statements for the Accounts were made available on a monthly basis to Plaintiff. (R. 33, Pl.'s Rule 56.1 Resp. ¶ 41.) JPMC further contends that the account statements were accessible to Plaintiff online going back seven years. (*Id.* ¶ 44.) Rachel Parker was Plaintiff's banker for her checking and savings accounts with JPMC from approximately September 2011 through June 2012. (*Id.* ¶ 26.) Parker asserts that prior to March 2012, she and Plaintiff spoke periodically about Plaintiff's bank accounts and Plaintiff did not notify Parker of any problems with her accounts concerning her husband. (*Id.* ¶ 27.) Plaintiff denies speaking to Parker before March 2012 about the Accounts. (*Id.*)

In March 2012, Plaintiff contacted Parker and told her that Plaintiff was having "personal issues" with Joel Kaplan and that Plaintiff wanted to keep their information separate from each other. (*Id.* ¶ 28.) Parker asserts that Plaintiff told her in April 2012 that she believed that she did not sign her name on the October 2009 Signature Card for Account 7373, which also contained the signature of Joel Kaplan and added him as a signer to Account 7373. (*Id.* ¶ 29.) Parker contends that in April 2012, Plaintiff indicated to her that she had concerns that Joel Kaplan was accessing her accounts. (*Id.* ¶ 30.) Parker asserts that prior to April 2012, Plaintiff did not provide her with written notice of any problems with her accounts concerning Joel Kaplan. (*Id.* ¶ 31.)

Plaintiff, on the other hand, contends that prior to March 19, 2012, she did not receive account statements for the Accounts; Plaintiff alleges that Parker told her that the bank statements "were made available online per notification to" Joel Kaplan's e-mail address, to

which Plaintiff did not have access. (R. 34-1, Pl.'s Decl. ¶ 21; R. 40, Def.'s Rule 56.1 Resp. ¶¶ 10-11.) JPMC explains that it sends e-mail notifications to its customers when their most recent statement becomes available online. (R. 40, Def.'s Rule 56.1 Resp. ¶¶ 10-11.) Plaintiff alleges that Parker gave her the bank statements on March 19, 2012. (R. 34-1, Pl.'s Decl. ¶ 23.) Plaintiff contends that after she learned of the unauthorized withdrawals by her husband, she wrote to Parker protesting those withdrawals on March 24, 2012, April 2, 2012, and May 1, 2012. (R. 40, Def.'s Rule 56.1 Resp. ¶ 12; R. 34-1, Pl.'s Decl. ¶¶ 23-26.) Parker denies receiving those letters from Plaintiff. (R. 40, Def.'s Rule 56.1 Resp. ¶ 12.)

On May 25, 2012, Plaintiff filed an emergency petition for a temporary restraining order and preliminary injunction ("motion for a TRO") in her divorce proceedings against Joel Kaplan in the Circuit Court of Cook County, Illinois. (R. 33, Pl.'s Rule 56.1 Resp. ¶ 21; R. 22-3, Ex. 3, Mot. for TRO.) In support of her motion for a TRO, Plaintiff submitted a sworn affidavit dated May 25, 2012, attesting that she "recently learned that without [her] knowledge or consent, Joel committed fraud by adding himself to [her] non-marital accounts as an authorized signatory and then moved significant sums of monies out of these accounts and into his own account and accounts in the children's names." (R. 33, Pl.'s Rule 56.1. Resp. ¶ 25; R. 22-3, Ex. 3, Mot. for TRO at 4-5.) The accounts at issue in the TRO included the Accounts at issue in this case. (R. 33, Pl.'s Rule 56.1. Resp. ¶ 23.)

## PROCEDURAL HISTORY

Plaintiff initiated this action in the Circuit Court of Cook County, Illinois on June 26, 2014. (R. 1-1, Compl.) On July 25, 2014, this action was removed to the U.S. District Court for the Northern District of Illinois. (R. 1, Notice of Removal.) Plaintiff's complaint asserts four counts against JPMC. (R. 1-1, Compl.) In Count I, Plaintiff alleges that JPMC breached its

agreement with Plaintiff by allowing and accepting forged signature cards from Joel Kaplan with

regard to Account 4531. (*Id.* ¶¶ 1-17.) In Count II, Plaintiff alleges that JPMC breached its duty

to Plaintiff by carelessly and negligently accepting new signatures cards from Joel Kaplan for

Account 4531. (*Id.* ¶¶ 18-35.) In Count III, Plaintiff alleges that JPMC breached its agreement

with Plaintiff by allowing and accepting forged signature cards from Joel Kaplan with regard to

Account 7373. (*Id.* ¶¶ 36-52.) In Count IV, Plaintiff alleges that JPMC breached its duty to

Plaintiff by carelessly and negligently accepting new signatures cards from Joel Kaplan for

Account 7373. (*Id.* ¶¶ 53-70.)

On September 2, 2014, JPMC moved to dismiss Counts II and IV of Plaintiff's

complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (R. 9,

Mot. to Dismiss.) On September 11, 2014, Plaintiff withdrew Counts II and IV without

prejudice. (R. 14, Min. Entry.) On November 26, 2014, JPMC moved for summary judgement

on the remaining counts (Counts I and III) in Plaintiff's complaint. (R. 20, Def.'s Mot. Summ.

J.) Plaintiff responded to JPMC's motion for summary judgment on March 2, 2015, (R. 31, Pl.'s

Resp.), and JPMC replied on March 23, 2015, (R. 41, Def.'s Reply).

Additionally, Plaintiff moved to amend her complaint on February 27, 2015. (R. 29,

Mot. to Amend.) Plaintiff attached to her motion a proposed amended complaint. (R. 29-1,

Proposed Am. Compl.) JPMC responded to Plaintiff's motion on March 23, 2015. (R. 39,

Def.'s Resp. to Mot. to Amend.)

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.

R. Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under

governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Id.* at 255; *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) ("[D]istrict courts are not required to draw every requested inference; they must only draw reasonable ones that are supported by the record."). The moving party has the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). The moving party "can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993).

Once the moving party has met this burden, the nonmoving party must "come forward with specific facts demonstrating that there is a genuine issue for trial." *Wheeler*, 539 F.3d at 634. "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. The nonmoving party must show that there is evidence upon which a jury reasonably could find for the plaintiff." *Id.* (citing *Anderson*, 477 U.S. at 251-52.) The nonmoving party may not rely on "mere conclusions and allegations" to create a genuinely disputed issue of material fact. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, the nonmoving party "must make a showing sufficient to establish any essential element of her cause of action for which she will bear the burden of persuasion at trial." *Smith on Behalf of Smith v. Severn*, 129 F.3d 419, 425 (7th Cir. 1997); *see*

*also Celotex*, 477 U.S. at 322-23. Weighing evidence and making credibility decisions are jury functions, and it is not appropriate for a judge to assume those functions when ruling on a motion for summary judgment. *Anderson*, 477 U.S. at 255.

## ANALYSIS

JPMC argues that the Court should enter summary judgment in its favor because Plaintiff's breach of contract claims are time-barred under the parties' contract and various provisions of the Illinois Uniform Commercial Code ("UCC"), 810 Ill. Comp. Stat. 5/1-101 *et. seq.* (R. 21, Def.'s Mem. at 5.) The Court addresses each of JPMC's arguments in turn.

## I.     Whether Plaintiff's claims are time-barred under the parties' contract

JPMC first argues that Plaintiff's breach of contract claims are time-barred under the Account Terms agreed upon by Plaintiff and JPMC.[2] (*Id.* at 6.) "A binding contract between a bank and its depositor is created by signature cards and a deposit agreement." *Cont'l Cas. Co., Inc. v. Am. Nat'l Bank & Trust. Co. of Chi.*, 768 N.E.2d 352, 357 (Ill. App. Ct. 2002); *see also Nat'l Bank of Monticello v. Quinn*, 533 N.E.2d 846, 849 (Ill. 1988) ("[T]he relationship between a drawer and a drawee is a contractual one."); *McKay v. Kusper*, 624 N.E.2d 1140, 1150 (Ill. App. Ct. 1993) ("The duties between a bank and a depositor are defined entirely by the terms of the account agreement between them[.]"); *Selby v. DuQuoin State Bank*, 584 N.E.2d 1055, 1058 (Ill. App. Ct. 1991) ("The express or implied contract between the depositor and the bank controls their relationship."). Here, the parties agree that the Account Terms govern the relationship between Plaintiff and JPMC. (R. 21, Def.'s Mem. at 7; R. 32, Pl.'s Resp. at 5.)

The Account Terms require Plaintiff to review her monthly account statements and to notify JPMC in writing of any errors or unauthorized items "within 30 days of the date on which

---

[2] The parties agree that Illinois law governs Plaintiff's breach of contract claims. (R. 21, Def.'s Mem. at 5-6; R. 32, Pl.'s Resp. at 5.)

the unauthorized item, or the Account statement that contained a description of the unauthorized item or error, was mailed, transmitted or otherwise made available to [Plaintiff]." (R. 33, Pl.'s Rule 56.1 Resp. ¶¶ 35-36; R. 22-2, Ex. A, Account Terms for Dec. 31, 2008, through Dec. 31, 2010, at 19; R. 22-2, Ex. B, Account Terms for Jan. 1, 2011, through Jan. 31, 2012, at 57.) The Account Terms also require Plaintiff to notify JPMC in writing of the non-receipt of an expected account statement within 30 days. (R. 33, Pl.'s Rule 56.1 Resp. ¶ 37; R. 22-2, Ex. A, Account Terms for Dec. 31, 2008, through Dec. 31, 2010, at 19; R. 22-2, Ex. B, Account Terms for Jan. 1, 2011, through Jan. 31, 2012, at 57.) Importantly, the Account Terms provide that if Plaintiff fails to report an unauthorized item or error, or that she did not receive her scheduled account statement, within this 30-day time frame, she agrees "that such items and errors shall therefore be fully enforceable against [her] and [she] shall have no claim against [JPMC] for same and shall be barred from brining any action against [JPMC] that is in any way related to the unauthorized item or errors." (R. 33, Pl.'s Rule 56.1 Resp. ¶ 37; R. 22-2, Ex. A, Account Terms for Dec. 31, 2008, through Dec. 31, 2010, at 19; R. 22-2, Ex. B, Account Terms for Jan. 1, 2011, through Jan. 31, 2012, at 57.)

Here, the parties dispute whether or not the account statements were "made available" to Plaintiff prior to March 2012, and also the date that Plaintiff first notified JPMC of the unauthorized transactions. Plaintiff attests that on March 13, 2012, she told Parker that she had never received her monthly statements for Accounts 4531 and 7373. (R. 34-1, Pl.'s Decl. ¶¶ 14-15, 20-21.) Plaintiff attests that she saw the account statements for the first time on March 19, 2012, and notified Parker in writing on March 24, 2012, of Joel Kaplan's unauthorized withdrawals. (*Id.* ¶¶ 16, 24.) Plaintiff thus argues that she gave JPMC written notice of the unauthorized withdrawals within the required 30-day period after she received the account

statements. (R. 32, Pl.'s Resp. at 6-7.) JPMC, on the other hand, contends that Plaintiff's

monthly account statements were made available to Plaintiff online, and that she first notified

Parker of the unauthorized transactions in April 2012. (R. 33, Pl.'s Rule 56.1 Resp. ¶¶ 30, 41.)

Regardless of these factual disputes, Plaintiff admits that March 13, 2012, was the first time she

notified JPMC that she was not receiving her account statements. (R. 34-1, Pl.'s Decl. ¶¶ 14-15,

20-21.) The alleged unauthorized transactions occurred between October 20, 2009, and May 19,

2011. Plaintiff thus waited almost a year from the last unauthorized transaction to notify JPMC

that she never received the account statements for those months, which is far in excess of the 30

days permitted under the parties' agreement. Therefore, under the Account Terms, Plaintiff is

barred from bringing a claim against JPMC relating to the unauthorized transactions.

In *Napleton v. Great Lakes Bank, N.A.*, the Illinois Appellate Court, faced with a similar

factual situation, barred the plaintiff's breach of contract claim against the bank. 945 N.E.2d

111, 112 (Ill. App. Ct. 2011). In that case the parties contractually agreed, pursuant to an

Account Agreement, that the plaintiff would have no claim for reimbursement of an

unauthorized check unless he notified the bank within 30 days of receiving his account

statement. *Id.* at 115. The plaintiff, however, did not notify the bank of any unauthorized

transactions on his account until four months after he received the monthly account statement on

which the forged check appeared. *Id.* The court therefore held that "because plaintiff failed to

notify the bank of the forgery within 30 days, the trial court did not err in finding that plaintiff

had no claim against [the bank]." *Id.* at 119; *see also Aliaga Med. Ctr., S.C. v. Harris Bank N.A.*,

21 N.E.3d 1203, 1210 (Ill. App. Ct. 2014) (finding that plaintiff's claim against the bank was

untimely where plaintiff failed to comply with its obligation, pursuant to the parties' agreement,

to notify the bank of any unauthorized payment within 60 days after receiving the account statement).

Accordingly, the Court finds that because Plaintiff failed to notify JPMC of her non-receipt of the statements for the Accounts within 30 days, she is barred from bring a claim against JPMC relating to the unauthorized transactions pursuant to the Account Terms.

## II.    Whether Plaintiff's claims are time-barred under the UCC

JPMC next argues that even if the Account Terms did not bar Plaintiff's claims, her claims are nevertheless time-barred under sections 4-406 and 3-118 of the UCC. (R. 21, Def.'s Mem. at 8-12.) While the Court finds that the notice provisions of the parties' agreement definitively extinguishes Plaintiff's claims, for the sake of completeness, the Court will also consider JPMC's arguments pertaining to the UCC.

### A.    Section 4-406

In Illinois, "the relationship between a bank and its customer is [also] governed by the Illinois Uniform Commercial Code."[3] *Napleton*, 945 N.E.2d at 114. Section 4-406 of the UCC is entitled, "Customer's duty to discover and report unauthorized signature or alteration." 810 Ill. Comp. Stat. 5/4-406. "The purpose of the section is to clearly define the bank customer's responsibility to examine its statement of account from the bank and promptly discover and

---

[3] The UCC generally governs the relationship between banks and its customers. *Napleton*, 945 N.E.2d at 114. Illinois courts have held, however, that where a parties' agreement modifies specific provisions of the UCC, the parties' agreement controls. *See Aliaga*, 21 N.E.3d at 1208-09 (the parties "entered into an agreement, which included specific notice and fee requirements for stopping payment of a check," and "[t]hose agreed-upon requirements superseded the UCC provision in question"); *Napleton*, 945 N.E.2d at 115 (finding that the parties' account agreement properly modified the terms of the UCC concerning the customer's duty to notify the bank of an unauthorized payment). Here, the parties' agreement does not specifically modify any provision of the UCC. However, the agreement adds a specific notice requirement regarding the non-receipt of account statements. The UCC does not contain such a notice requirement, and therefore the agreement's notice provision does not affect the Court's analysis of section 4-406.

report any unauthorized payments." *Napleton*, 945 N.E.2d at 114. Section 4-406 provides, in

pertinent part:

> (c) If a bank sends or *makes available* a statement of account or items pursuant to subsection (a), the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

> (d) If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by subsection (c), the customer is precluded from asserting against the bank:

>> (1) the customer's unauthorized signature or any alteration on the item, if the bank also proves that it suffered a loss by reason of the failure; and

>> (2) the customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank.

810 Ill. Comp. Stat. 5/4-406(c)-(d) (emphasis added).

JPMC first argues that Plaintiff's claims are time-barred under section 4-406(d). (R. 21,

Def.'s Mem. at 8-10.) JPMC contends that it "made available" to Plaintiff her account

statements on a monthly basis, and that her account statements were available online going back

seven years. (*Id.* at 9.) According to JPMC, if Plaintiff had complied with her duty under

section 4-406(c) to promptly examine her account statements, she would have discovered the

Transactions and been able to notify JPMC within a reasonable time not to exceed 30 days. (*Id.*)

JPMC thus argues that because Plaintiff did not give JPMC the requisite notice pursuant to

section 4-406(d), she is barred from asserting her claims against it. (*Id.*) Plaintiff argues that she

did not receive her account statements until Parker gave them to her on March 19, 2012. (R. 32,

Pl.'s Resp. at 7.) Plaintiff asserts that once she received her account statements and noticed the Transactions, she immediately gave notice to Parker on March 24, 2012. (*Id.*) Thus, Plaintiff argues that her claims are not time-barred under section 4-406(d). (*Id.*)

While Plaintiff asserts that she did not "receive" her account statements until March 19, 2012, she does not directly refute JPMC's contention that her account statements were "made available" to her. In support of its contention, JPMC offers a declaration from Cathy Marinelli, Managing Director and Operations Executive for JPMC, who attests that account statements for the Accounts were made available on a monthly basis to Plaintiff. (R. 22-4, Ex. 4, Marinelli Decl. ¶ 5.) Marinelli also attests that account statements for the Accounts were accessible to Plaintiff online going back seven years; Marinelli explains that Plaintiff could access her bank statements online using her online banking User ID, which she created on January 12, 2009. (*Id.*; R. 40-3, Ex. C, Marinelli Decl. ¶¶ 3-7.) JPMC also offers Joel Kaplan's declaration in support. (R. 40-1, Ex. A, Joel Kaplan's Decl.) Joel Kaplan attests that beginning in January 2009, Plaintiff received account statements in hard-copy via mail at their home. (*Id.* ¶ 8.) Months after the Accounts were opened, Joel Kaplan attests that they started receiving statements on a "paperless" basis; he claims that both he and Plaintiff had online access to the Accounts. (*Id.* ¶ 9.) Additionally, JPMC notes that Plaintiff was able to obtain her account statements at her JPMC branch by requesting them either in person or by phone. (R. 41, Def.'s Resp. at 8-9.) Plaintiff provides no evidence to the Court to counter JPMC's evidence that the account statements were made available to her. Instead, Plaintiff appears to be arguing that the account statements were not "made available" to her because she never "received them." (R. 32, Pl.'s Resp. at 7.) However, Plaintiff has not provided, and the Court was unable to find, any case law to support her argument that physically receiving a statement is necessary for a statement to

be considered available. Thus, the Court finds that the account statements detailing the Transactions were made available to her for purposes of section 4-406 during the relevant time period. Because Plaintiff failed to notify JPMC of the Transactions within 30 days, the Court concludes that she is precluded from asserting a claim against JPMC under section 4-406(d). *See Travelers Cas. & Sur. Co. of Am. v. Wells Fargo Bank N.A.*, 374 F.3d 521, 528 (7th Cir. 2004) (explaining that under section 4-406(d), the customer has a duty "to notify the bank that unauthorized checks are being written on its account, if such notification is feasible because the bank has given the customer a statement of his account that the customer can compare with his own records and by doing so readily discover the fraud," and the "violation of this duty gives the customer's bank a defense"); *Watseka First. Nat'l Bank v. Horney*, 686 N.E.2d 1175, 1179 (Ill. App. Ct. 1997) (plaintiff's claims barred under section 4-406 where statements containing the cancelled checks had been sent to plaintiff every month and "if [plaintiff] had examined the cancelled checks, the forgeries would have been readily discoverable").

In an effort to avoid this result, Plaintiff argues that section 4-406(d) is not applicable because it is preempted by section 4-406(e). (R. 32, Pl.'s Resp. at 7.) Section 4-406(e) provides as follows:

> If subsection (d) applies and the customer proves that the bank failed to exercise ordinary care in paying the item and that the failure substantially contributed to loss, the loss is allocated between the customer precluded and the bank asserting the preclusion according to the extent to which the failure of the customer to comply with subsection (c) and the failure of the bank to exercise ordinary care contributed to the loss. If the customer proves that the bank did not pay the item in good faith, the preclusion under subsection (d) does not apply.

810 Ill. Comp. Stat. 5/4-406(e). Plaintiff argues that JPMC has not acted in good faith. (R. 32, Pl.'s Resp. at 6.) Specially, Plaintiff contends that "JPMC acted in bad faith by accepting two forged signature cards adding additional signatories to plaintiff's account without even checking

15

with plaintiff." (*Id.*) Plaintiff therefore argues that because JPMC acted in bad faith, the preclusion under section 4-406(d) does not apply. (*Id.*)

The UCC defines good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing." 810 Ill. Comp. Stat. 5/3-103(a)(4). Other than her conclusory assertion, Plaintiff has failed to provide the Court with any evidence to prove that JPMC failed to act in good faith during the relevant time period. *See Falk v. N. Trust Co.*, 763 N.E.2d 380, 387 (Ill. App. Ct. 2001) ("merely reciting the words 'actual knowledge' and 'bad faith'" is insufficient to establish that the bank acted in bad faith). She has failed to provide any evidence demonstrating that JPMC knew that the October 2009 Signature Cards were forged, or that Joel Kaplan had no authority to add himself as a signatory. She also has failed to provide any evidence showing that JPMC knew that she was not receiving her monthly account statements. Additionally, there is no evidence in the record demonstrating that JPMC failed to observe reasonable commercial standards of fair dealing. Because nothing in the record supports a finding that JPMC failed to pay any items in good faith, the Court cannot find that Plaintiff was excused from giving JPMC notice of the Transactions within 30 days.

Additionally, JPMC argues that Plaintiff's claims are time-barred under section 4-406(f). (R. 21, Def.'s Mem. at 10-11.) Section 4-406(f) provides as follows:

> Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer (subsection (a)) discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration. If there is a preclusion under this subsection, the payor bank may not recover for breach of warranty under Section 4-208 with respect to the unauthorized signature or alteration to which the preclusion applies.

810 Ill. Comp. Stat. 5/4-406(f). "[S]ection 4-406(f) is a rule of substantive law that creates a statutory prerequisite to filing suit." *Euro Motors, Inc. v. Sw. Fin. Bank & Trust Co.*, 696 N.E.2d

711, 716 (Ill. App. Ct. 1998). The one-year time period "is not a statute of limitations; it does not give a customer a year to bring suit. Rather, it simply requires the customer to notify the bank of an unauthorized signature or alteration within a year in order to *preserve the right* to bring suit." *Id.* The one-year time limit applies to all claims against a bank for payment on an unauthorized signature or alteration, whether such claims are brought under the UCC or common law. *Id.* Additionally, Illinois courts have held that "section 4-406(f) requires that a bank act in 'good faith' when paying the items on the statement in order to claim the protection of the prerequisite of notice requirement contained in that section." *Falk v. N. Trust Co.*, 763 N.E.2d 380, 387 (Ill. App. Ct. 2001).

As explained above, this Court has already concluded that JPMC acted in good faith during the period the Transactions took place, and therefore, section 4-406(f) is applicable. Plaintiff contends that she first notified Parker of the Transactions on March 24, 2012. (R. 34-1, Pl.'s Decl. ¶ 24.) Thus, under section 4-406(f), Plaintiff is barred from bringing any claims against JPMC for the Transactions that occurred prior to March 24, 2011. Plaintiff's claims relating to the Transactions that occurred between March 24, 2011, and May 19, 2011, however, are not time-barred under section 4-406(f). Regardless, as discussed above, Plaintiff's claims against JPMC for all the Transactions are time-barred under the parties' contract and section 4-406(d) of the UCC.

**B.    Section 3-118(g)**

Finally, JPMC argues that Plaintiff's claims are also time-barred under section 3-118(g) of the UCC. Section 3-118(g) provides as follows:

> Unless governed by other law regarding claims for indemnity or contribution, an action (i) for conversion of an instrument, for money had and received, or like action based on conversion, (ii) for breach of warranty, or (iii) to enforce an

17

obligation, duty, or right arising under this Article and not governed by this Section must be commenced within 3 years after the cause of action accrues.

810 Ill. Comp. Stat. 5/3-118(g).[4] "Courts in Illinois have held that a limitations period generally begins to run 'when facts exist which authorize one party to maintain an action against another.'" *Rodrigue v. Olin Emps. Credit Union*, 406 F.3d 434, 441 (7th Cir. 2005) (quoting *Sundance Homes, Inc. v. Cnty. of DuPage*, 746 N.E.2d 254, 266 (Ill. 2001)).

Here, the Transactions occurred between October 20, 2009, and May 19, 2011. Plaintiff did not file her complaint, however, until June 26, 2014. (R. 32, Pl.'s Resp. at 9.) Thus, because the Transactions occurred before June 26, 2011, Plaintiff's claims are also time-barred under section 3-118(g). *See Hawkins v. Nalick*, 975 N.E.2d 793, 796 (Ill. App. Ct. 2012) (finding that plaintiff's cause of action based on conversion against the bank was time-barred under section 3-118(g)).

Plaintiff acknowledges that the three-year statute of limitations applies to any unauthorized transaction that took place before June 26, 2011. (R. 32, Pl.'s Resp. at 9.) Nevertheless, Plaintiff argues that the running of the three-year limitations period should be tolled through the application of the discovery rule. (*Id.*) Plaintiff contends that because she initiated this action within three years of her discovery of the Transactions on March 19, 2012, the Court should consider her claims timely. (*Id.*)

"The discovery rule is a judicially created rule that tolls the beginning of a statute of limitations until the injured plaintiff knows or reasonably should know that she has been injured

---

[4] The statute of limitations in section 3-118(g) applies to claims arising under Article 3 of the UCC, which governs negotiable instruments. JPMC assumes that Plaintiff is seeking "to enforce an obligation, duty, or right arising under Article 3 of the UCC," and Plaintiff does not directly refute this assumption. (R. 21, Def.'s Mem. at 11-12; R. 32, Pl.'s Resp. at 8-9.) Because the parties assume that Article 3 applies to the facts of this case, the Court will analyze the parties' arguments relating to section 3-118(g).

and that her injury was wrongfully caused." *Hawkins*, 975 N.E.2d at 796. Illinois courts have held, however, that "the discovery rule does not toll the running of the three-year statute of limitations set forth in section 3-118(g) of the UCC." *Id.* at 798; *see also Kidney Cancer Ass'n v. N. Shore Cmty. Bank & Trust Co.*, 869 N.E.2d 186, 195 (Ill. App. Ct. 2007) ("[T]he victim of the conversion is in the best position to easily and quickly detect the loss and take appropriate action. Thus, while it may be harsh not to apply the discovery rule in certain cases, the rule is inapplicable absent fraudulent conduct."); *Haddad's of Ill., Inc. v. Credit Union 1 Credit Union*, 678 N.E.2d 322, 325 (Ill. App. Ct. 1997) ("[T]he vast majority of authority runs strongly against applying the discovery rule to an action for conversion of negotiable instruments in the absence of fraudulent concealment on the part of the defendant asserting the defense of the statute of limitations."). In *Hawkins*, the appellate court explained that the "[a]pplication of the discovery rule to a cause of action for the conversion of a negotiable instrument undermines the underlying goals of the UCC," such as "certainty of liability, finality, predictability, uniformity, and efficiency in commercial transactions." 975 N.E.2d at 799.

Here, Plaintiff has provided the Court with no evidence from which it can conclude that JPMC fraudulently prevented Plaintiff from discovering the Transactions. The Court therefore concludes that the discovery rule does not apply. In any event, the discovery rule would not help Plaintiff. The discovery rule "postpones accrual not to when the claim is discovered, but only to when the claim should have been discovered." *Travelers*, 480 F.3d at 504. Plaintiff attests that in April 2011, she received a telephone call from a representative from JPMC informing her that fraudulent activity had occurred on Accounts 4531 and 7373; the money from those accounts was thereafter transferred to two new accounts. (R. 34-1, Pl.'s Decl. at 1.) Thus, at a minimum, Plaintiff should have reviewed her statements for Accounts 4531 and 7373 and discovered the

19

unauthorized transactions in April 2011. Accordingly, even if the Court applied the discovery rule, Plaintiff's claims would still be time-barred.

Additionally, Plaintiff attempts to avoid application of the three-year limitations period by arguing that her action is based upon breach of contract, not the UCC, and thus section 3-118(g) does not apply. (R. 32, Pl.'s Resp. at 12-13.) Under section 13-206 of the Illinois Code of Civil Procedure (the "Code"), the applicable statute of limitations for a written contract is ten years. 735 Ill. Comp. Stat. 5/13-206; *see also Cont'l Cas. Co.*, 768 N.E.2d at 363 ("Section 13-206 [of the Code] is a general, catch-all statute that applies not only to written contracts but also to actions on bonds, bills of exchange, promissory notes, written leases and other evidences of indebtedness."). "Where two statutes of limitation arguably apply to the same cause of action, the one which more specifically relates to the action must be applied." *Haddad's*, 678 N.E.2d at 324; *see also Watseka*, 686 N.E.2d at 1178. Here, Plaintiff is seeking to hold JPMC responsible for the funds Joel Kaplan allegedly withdrew without consent from her Accounts, which he was able to do because he allegedly forged her signature on the October 2009 Signature Cards. Thus, the Court finds that the limitation period in section 3-118(g) of the UCC more specifically relates to Plaintiff's cause of action than the general breach of contract limitation period in section 13-206 of the Code. *See Haddad's*, 678 N.E.2d at 324 (applying the three-year statute of limitations in section 3-118(g) because it more specifically related to plaintiff's claim against financial institution over forged endorsements); *see also Continental*, 768 N.E.2d at 363 (applying the three-year limitations period of UCC section 4-111 because "in this case it is more specific than the 10 year limitations period found in section 13-206 of the Code," and "[a]pplying the 10 year limitations period to a breach of contract claim involving negotiable instruments that are deposited into and paid by the banking system would not foster and promote commercial finality

and certainty"); *Watseka*, 686 N.E.2d at 1178 ("[d]espite [plaintiff's] attempt to find shelter in the ten-year limitations statute by claiming breach of contract, section 4-406, because of its specificity, [took] precedence over the general limitations statute" in case brought against bank for honoring checks made payable to fictitious payees).

Accordingly, the Court finds that Plaintiff's claims are also time-barred under section 3-118(g). Because Plaintiff's claims are time-barred under the parties' contract, as well as under sections 4-406 and 3-118 of the UCC, the Court grants summary judgment in favor of JPMC.

## III.    Plaintiff's motion for leave to file an amended complaint

On February 27, 2015, eight months after filing her complaint, Plaintiff moved to amend her complaint and submitted a proposed amended complaint. (R. 29, Mot. to Amend; R. 29-1, Proposed Am. Compl.) Plaintiff seeks to amend her complaint because "during the preparation of a Response to Defendant's Motion for Summary Judgment, counsel for plaintiff learned that the accounts in question, that is accounts 4531 and 7373 were superseded by two other bank accounts." (R. 29, Mot. to Amend.) In her proposed amended complaint, Plaintiff alleges that on or about April 29, 2011, JPMC informed her that Account 4531 was changed to Account 0250, and that Account 7373 was changed to Account 0610. (R. 29-1, Proposed Am. Compl. ¶¶ 21, 45.) Plaintiff alleges that unbeknownst to her, there were signature cards for Accounts 0250 and 0610 that contained Joel Kaplan's signature and her forged signature. (*Id.* ¶¶ 24, 48.) With the addition of these subsequent accounts, Plaintiff seeks to extend the time period during which Joel Kaplan allegedly withdrew funds without her consent. In her proposed amended complaint, Plaintiff alleges that from October 20, 2009, to April 17, 2012, Joel Kaplan withdrew

approximately $377,000 from Accounts 4531 and 0250, and approximately $662,000 from Accounts 7373 and 0610.[5] (*Id.* ¶¶ 25, 49.)

JPMC argues that Plaintiff's motion for leave to file an amended complaint should be denied because Plaintiff has known about the existence of Accounts 0250 and 0610 since she opened them in April 2011, which is over three years before she filed her first complaint in this action. (R. 39, Def.'s Resp. to Mot. to Amend at 5.) JPMC asserts that Plaintiff has failed to provide any explanation for why she waited until the last business day before her opposition to JPMC's motion for summary judgment was due to seek to file an amended complaint. (*Id.* at 6.)

Federal Rule of Civil Procedure 15(a)(2) provides that after an answer or dispositive motion is filed, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "[A] request to allow the complaint to be amended is addressed to the judge's discretion." *Springman v. AIG Mktg., Inc.*, 523 F.3d 685, 690 (7th Cir. 2008). "Although the rule reflects a liberal attitude towards the amendment of pleadings, courts in their sound discretion may deny a proposed amendment if the moving party has unduly delayed in filing the motion, if the opposing party would suffer undue prejudice, or if the pleading is futile." *Campaign Mgmt. Co., Inc. v. Rooks, Pitts & Poust*, 290 F.3d 843, 848-49 (7th Cir. 2002) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Arreloa v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008) ("district courts have broad discretion to deny leave to amend where there is undue

---

[5] The Court notes that curiously, while the proposed amended complaint seeks to expand the time period during which Joel Kaplan improperly withdrew funds, the total dollar amount of those alleged wrongful withdrawals decreases by $1,273. In her original complaint, Plaintiff alleges that Joel Kaplan withdrew a total of $1,040,273 from Accounts 4531 and 7373. (R. 1-1, Compl. ¶¶ 15, 50.) Yet in her proposed amended complaint, Plaintiff alleges that Joel Kaplan withdrew a total of $1,039,000 from Accounts 4531, 0250, 7373, and 0610. (R. 29-1, Proposed Am. Compl. ¶¶ 25, 49.)

delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile").

Here, Plaintiff admits in her proposed amended complaint that she knew that Accounts 0610 and 0250 were opened in April 2011. (R. 29-1, Proposed Am. Compl. ¶¶ 21, 45.) Plaintiff explains in her declaration that she opened Accounts 0610 and 0250 to replace Accounts 4531 and 7373 because JPMC had informed her in April 2011 that the latter accounts had been subjected to fraudulent activities. (R. 34-1, Pl's Decl. at 1.) Plaintiff also admitted this fact back in May 2012 in her divorce proceedings when she sought to enjoin Joel Kaplan from using any bank accounts held jointly or individually in his or her name. (R. 22-3, Mot. for TRO at 8.) In her motion for a TRO, Plaintiff asserted that:

> In April 2011, [she] was alerted by [JPMC] that accounts were subject to third-party fraud. With Joel's encouragement, [Plaintiff] authorized [JPMC] to open new accounts (checking ending 0610 and savings ending 0250) and transfer the balance of the funds into these accounts. Then without [Plaintiff's] knowledge or consent, Joel forged [her] signature and added himself to the accounts to give him the power to withdraw funds.

(Id.) Additionally, in her motion for a TRO, Plaintiff asserted that Joel Kaplan improperly withdrew funds "from the old and new accounts combined." (R. 22-3, Mot. for TRO at 8.) Thus, Plaintiff has known that Joel Kaplan made unauthorized transactions in Accounts 0610 and 0250 at least since May 2012, when she filed her motion for a TRO. Further, in August 2012, Plaintiff subpoenaed records from JPMC for all her accounts. (R. 39-3, Ex. C, Subpoena, at 4.)

It is clear from the evidence that Plaintiff knew of Accounts 0610 and 0250 and believed that Joel Kaplan was improperly withdrawing funds from those accounts since at least two years before she filed her initial complaint. Yet Plaintiff is seeking to amend her complaint because her counsel only recently learned that the funds in Accounts 4531 and 7373 were transferred to Accounts 0610 and 0250, respectively. It is unclear to the Court why Plaintiff would have

withheld this information from her counsel. Further, Plaintiff's counsel in this case also represents her in her divorce proceedings; counsel filed an appearance in her divorce proceedings on June 2, 2014. (R. 39-2, Ex. B, State Court Docket Sheet.) Thus, it is somewhat puzzling to the Court how counsel could have been unaware of the new accounts considering he had access to all the files associated with Plaintiff's divorce proceedings, including her motion for a TRO and the records for Accounts 0610 and 0250. While the Court does not condone counsel's oversight, the Court can find no direct evidence of bad faith or dilatory motive exhibited by counsel. Further, the Court recognizes that this is Plaintiff's first attempt to cure deficiencies in her complaint. Additionally, the case is less than a year old and discovery has yet to occur. Finally, while JPMC would prefer not to "expend additional resources" to litigate the merits of the case, (R. 39, Def.'s Resp. to Mot. to Amend at 6), the Court finds that this inconvenience does not rise to the level of undue prejudice. *See Patrick v. City of Chi.*, No. 14-cv-3658, 2015 WL 1880389, at *6 (N.D. Ill. Apr. 23, 2015) (granting plaintiff leave to amend where defendant could not identify any "prejudice to them beyond the inconvenience of having to move for dismissal of the new claim, and such inconvenience does not outweigh the liberal policy toward leave to amend embodied in Rule 15(a)"); *Parker v. EMC Mortg. Co.*, 2014 WL 7205474, at *4 (N.D. Ill. Dec. 18, 2014) (finding no undue prejudice where the "new allegations would merely provide additional support for a legal theory of which Defendants have been on notice"). Given the liberal standard under Rule 15, the Court in its discretion will grant Plaintiff leave to file an amended complaint.

The Court rejects Plaintiff's proposed amended complaint, however, and orders Plaintiff to file a new amended complaint that is consistent with this Court's ruling on summary judgment. As explained above, because Plaintiff alleges that she first gave notice to JPMC of the

24

Transactions on March 24, 2012, her claims for the period of October 20, 2009, through February 22, 2012, are time-barred.[6] Thus, Plaintiff's new amended complaint should only include unauthorized transactions that occurred during the time period of February 23, 2012, through April 17, 2012.

## CONCLUSION

For the foregoing reasons, JPMC's motion for summary judgment (R. 20) is GRANTED. Plaintiff's motion for leave to file an amended complaint (R. 29) is GRANTED. Plaintiff is directed to file an amended complaint that is consistent with this Court's decision by June 15, 2015. The parties are directed to exhaust all settlement possibilities prior to the next status date, which will be held on June 17, 2015, at 9:45 a.m.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: May 12, 2015**

---

[6] JPMC improperly calculated this period to be October 20, 2009, though February 24, 2012. (R. 39, Def.'s Resp. to Mot. to Amend at 7.) However, 30 days prior to March 24, 2012, is February 23, 2012. Thus, Plaintiff has a potential claim for any unauthorized transactions that occurred on or after February 23, 2012.